# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Erin O'Brien, a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since October 2019. I am currently assigned to the FBI Boston Joint Terrorism Task Force (JTTF). During my time assigned to the FBI Boston JTTF, I have investigated and participated in the investigations of domestic terrorism violations. During the course of these investigations, I have conducted analysis of digital records, social media, cloud communications, email tracing, physical and electronic surveillance, assisted in the execution of arrest and search warrants, debriefed informants, and reviewed pertinent records and evidence. From these experiences and the training related to counterterrorism matters, I have become familiar with how individuals conduct criminal activity in-person and online, to include but not limited to, the efforts for individuals to obfuscate their identity and activity to avoid detection by law enforcement.

2.  As part of my duties, I am authorized to investigate violations of the laws of the United States, including criminal violations relating to computer-system intrusions, internet and cyberstalking, including but not limited to violations of 18 U.S.C. § 2261A(2)(B).

3.  I make this affidavit in support of a criminal complaint and arrest warrant charging EDWARD JOHN KAY ("KAY") (DOB XX/XX/1971), of Rigby, Idaho, with cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B) (the "Target Offense").

4.  Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause

1

to secure a criminal complaint. Where statements of others are set forth in this affidavit, they are set forth in substance and in part.

5.      The information and statements contained in this affidavit are based upon my personal observations and knowledge gained during this investigation, including interviews of victims and witnesses, information provided and written reports about this that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of subpoenas and other records; independent investigation and analysis by FBI agents/analysts; and my experience, training, and background as a Special Agent with the FBI.

## PROBABLE CAUSE

### *KAY's Conduct*

6.      On January 20, 2025, the Victim,[1] a resident of Massachusetts, clinical psychologist, and professor at the University Extension School ("UES")[2], received an email from KAY. KAY was enrolled in the Victim's UES course on psychosis (hereinafter "the Course"), which was offered via Zoom. In his email, KAY introduced himself and requested a call prior to or following the first lecture scheduled for January 29, 2025, to discuss the Course structure and determine if the Course would be a good fit for him. KAY also described his educational and professional background and disclosed that he was diagnosed with Bipolar I disorder in 2020.

7.      On January 25, the Victim responded to KAY's email and scheduled a Zoom call for the afternoon of January 28. The Zoom call lasted approximately 40 minutes. During the call, KAY appeared manic, displayed an agitated need to speak, stated he wanted to teach the Victim

---

[1] The identity of the victim is known to law enforcement but redacted here to preserve her privacy.

[2] The name of the university is known to law enforcement but redacted here to preserve the Victim's privacy.

25-mj-3141-JDH

"so many new things," and expressed a desire to have a deeper connection with the Victim. The Victim got the impression that KAY's feelings for her were romantic in nature. It was clear to the Victim that KAY had already done extensive research on her prior to this phone call. The Victim described the call as unsettling.

8. The following day, on January 29, the Course had its first Zoom lecture. KAY was an active participant in this session. When the Victim did not call on KAY, she noticed he made exasperated facial expressions. KAY stayed after class to express his discontent with not being called on more as well as his dissatisfaction with the class structure, specifically that it did not allow for more one-on-one time between student and professor. KAY then informed the Victim of his background in web security. This made the Victim uncomfortable because she believed that it meant KAY would have the knowledge and skills to obtain personal information about her that was available on the internet, if he had not already done so.

9. On January 30, KAY emailed the Victim requesting another virtual office visit to provide class feedback and discuss extra credit opportunities. On January 31, the Victim responded to KAY's email and advised they could have a 20-minute virtual office visit in the upcoming two weeks. KAY responded and conveyed that he was still trying to determine if this class structure was the right fit for him. He brought up the possibility of dropping the Course and stated: "I wouldn't take a withdrawal lightly. I have a real difficult choice here. I realize that there will be many things I lose in doing so. . . . I lose ever knowing you, in any way . . . ."

10. On February 2, KAY emailed the Victim twice to notify her of his decision to withdraw from the Course. KAY made the following statements:

> "As much as I wanted you as my teacher, I wanted you as a friend, or even as a therapist, even more…A close female friend of mine described what I have with you as a bit of a, 'brain crush.'…I am also used to having older, or male professors. I am not used to having someone only slightly older than my life partner…It just would be a living hell to sit

through class with that little interaction with you. I really, truly mean that… You are such a rare, unusual creature for me to run into in my current world right now. I adore my life partner, and she is supremely intelligent, but I crave more diverse, personal, intellectual, meaningful interaction than just with her…I wanted so much to make a difference in your life. Yet the irony is you made a difference in mine. You were always the one in control. Until the day I die, I will never forget the beautiful, both inside and out, young [the University] instructor that brought some clarity to my thoughts, feelings, conflicts, and emotions in such a powerful and meaningful way."

11. The Victim found this email to be strange, especially the unnecessary mention of her age and gender which made the message feel sexual in nature. She was relieved that KAY withdrew from her course but was uncomfortable with the word choice throughout his withdrawal email. Most unsettling was his use of her son's name and age. KAY wrote: "You reminded me of what hard work looks like with all that you have taken on in your life while simultaneously attending to your 3 year old son, [first name of Victim's son]."

12. On February 3, the Victim acknowledged receipt of KAY's withdrawal emails.

13. On February 4, the Victim received a LinkedIn connection request from KAY.

14. On February 5, the Victim received an email from KAY wherein he expressed disappointment in her most recent email, explaining that he expected something "warmer." KAY acknowledged the brief duration of their contact, stating: "More than anything, I just want you to know that our connection, however brief, mattered a lot to me."

15. From February 5, 2025 to March 21, 2025, the Victim received no direct communication from KAY. During this time, the Victim was nervous and hopeful that she would not hear from KAY again, but it was always in the back of her mind that he could resurface.

16. On March 21, KAY emailed the Victim a document titled "[Victim's first name]-Reflection-Letter." In the letter, KAY touched on a variety of topics, expressed his sorrow over dropping the Victim's course, and requested a Zoom call with the Victim for him to gain closure. KAY also made the following statements:

4

"I lost the ability to keep myself composed with a person I see as being so incredibly magnificent. I emotionally bled all over my interaction with you…The fact that you had that much power over me is not something I am used to experiencing from someone…It should be blatantly obvious that I personally like you. Your intuition should have clearly told you that…I know how busy you are with a full-time job, teaching with [U]ES, [first name of Victim's son], and so many other things…"

17.     This letter, and in particular KAY's use of the phrase "emotionally bled" and the invocation of her son's name again, made the Victim feel extremely uncomfortable and unsafe because she felt like KAY was obsessively focused on her. KAY's statement referencing the "power" he felt she had over him made the Victim concerned that KAY was becoming delusional. In this letter, KAY also proposed the idea of enrolling in another one of the Victim's classes in the future. The Victim was alarmed by this possibility, and after this message, she became increasingly concerned not only for her safety but also for the safety of her family.

18.     On March 29, KAY emailed the University's Office of the Dean and the Victim accusing the University and the Victim of negligence and causing him severe psychological harm, and alleging, among other things, that the University and the Victim created an unsafe environment for emotionally or psychologically vulnerable students. After receiving this email, the Victim reported KAY to the University Police Department.

19.     On March 30, KAY emailed the University and the Victim proposing a collaborative initiative between the University and KAY's company, ODTHA, Inc.,[3] and an immediate reassignment of the Victim to a new role in this initiative of "Director of Ethical Innovation and Student Wellbeing." KAY once again referenced the Victim's minor child by name

---

[3] According to the company's LinkedIn page, ODTHA stands for "One Day This Heart Awakens" and is a "consciousness driven organization at the intersection of emotional integrity, artificial intelligence, and institutional ethics." In this March 30 email, KAY stated that he is the founder of ODTHA, Inc.

5

in this email. The Victim feared the combination of adoration and increased hostility in KAY's communications could lead to physical harm.

20. On April 1, KAY sent the Victim a message via LinkedIn in which he professed his love for her and described a paranormal encounter he had in a graveyard near his apartment in Berlin, Germany. KAY stated:

> "I miss you-truly, deeply- with all of my heart and soul. That day I saw you on Zoom…You were the most beautiful thing I have ever seen. Not just appearance. Everything. Your presence. Your mind. Your light. To gain you…and then to lose you like that? It devastated me."

21. This message scared the Victim because she believed he might use violence to bring her back into his life.

22. On April 3, the Victim emailed KAY and asked him not to contact her anymore and directed him to contact the University's Office of Student Affairs for any future communications.

23. In April, KAY posted to his LinkedIn page almost daily, detailing his grievances toward the University. During this time, the Victim reported waking up every day feeling like she could not get away from him and thinking: "What will he do to target me next?" She got into the habit every morning of immediately checking KAY's newest LinkedIn posts because she was worried about what he might do next. The Victim described wondering every day whether the next day would be the day KAY showed up to find her in person or she received explosives or poison in the mail. The Victim described these thoughts as taking over her life.

24. On April 24, the Victim received a long Facebook message from a user on Facebook (hereinafter "JD") with the display name "[JD's full name] CCHt". JD stated that she was KAY's life partner. JD warned the Victim about KAY's unhealthy obsession with the Victim, his access to numerous weapons, and his refusal to seek treatment for his Bipolar I disorder. JD

6

mentioned that in the past year, KAY had a fixation on two additional women but that neither compared to his intense fixation on the Victim. JD noted that KAY believed he was an archangel on a divine mission and that KAY considered the Victim to be his "twin angel soul mate." JD stated that KAY believed his future involved a romantic relationship with the Victim. JD stated that KAY has many firearms that he did not allow her to access, so she was unable to "reduce any 'risk' of him using them on himself or others." She went on to state: "I worry about the seeking or [sic] glory through perceived altruistic or noble causes to figuratively and literally lay his life on the line." She explained: "I am deeply concerned that he is self destructing and sabotaging his life in a manic state that is going to result in a dangerously risky crash . . . ." JD described that during a mental breakdown at a local Home Depot in April 2020, KAY "believed he was God or at least Jesus…" KAY was hospitalized for a week after the incident and diagnosed with Bipolar I Disorder. The message from JD terrified the Victim and made her extremely concerned for her and her family's safety. She believed that if KAY were to travel to the Boston area, he would try to confront her or her family.

25. A review of police reports indicated that on April 20, 2020, Idaho Falls Police Department reported to a Home Depot in Idaho Falls, Idaho for a weapons violation involving KAY. KAY allegedly was carrying a concealed weapon[4] and threatened to shoot another male.

---

[4] Idaho does not require a permit to concealed carry a firearm. Idaho also does not require registration of firearms or records of sale to be sent to law enforcement, so neither local law enforcement nor the FBI has been able to identify the specific quantity or type of guns KAY owns in Idaho. However, based on information JD shared with neighbors, local law enforcement has reason to believe KAY has numerous firearms. Separately, the FBI has reason to believe KAY owns numerous firearms based on a Pennsylvania record of sale query (where KAY previously resided) which showed KAY purchased 21 handguns from a licensed firearms dealer in the state of Pennsylvania between 1993 and 2019, and based on information shared by JD in her Facebook message to the Victim ("Edward is passionate about them and is very protective of his right to own them and carry them for protection. Most of the guns here are licked [sic] in places I do not have

26. In late April, the Victim had a phone meeting with another UES Professor who taught KAY (hereinafter "Professor A"), to discuss Professor A's interactions with KAY. Professor A described having a two-hour meeting with KAY wherein he described his relationship and obsession with the Victim. KAY spoke about separating the Victim from her husband. KAY also told Professor A that he believed he was a psychopath. Professor A told the Victim that she believed that the Victim and her husband were not safe.

27. On May 8, KAY again emailed the University's Office of the Dean, as well as several other of the University's offices, and copied the Victim. KAY stated that a formal licensing board complaint would be filed against the Victim with the Massachusetts Board of Registration of Psychologists. He added: "This is not about employment with [the University]. It is about the ethical standing of her license, her entire career and future in the field of clinical psychology long after [the University] has come and GONE in her life, and the consequence of sustained, documented silence."

28. On May 9, KAY again emailed the same offices at the University, threatening that the University had only three hours left to reply to him otherwise he would submit the licensing board complaint. He stated: "Dr. [Victim's last name] has been copied on all communications. She knows what is coming." He added that this was only the "VERY BEGINNING" because "Every day, starting today, will mark a **new action of serious consequence**, taken by me in accordance with divine alignment and institutional justice."

29. Also on May 9, KAY submitted a formal complaint against the Victim to the Bureau of Health Professions Licensure alleging negligence that caused him to spiral into a

---

access to of [sic] know the codes to get into."). I am aware that pursuant to federal law, airline passengers may transport firearms in checked luggage.

suicidal crisis. Because of this pending claim against her, the Victim has been unable to obtain the necessary liability insurance to open her own clinical practice. The Victim reported being very stressed about the financial and reputational consequences this claim could have against her.

30. On May 12, the Victim received an email from [the Victim's nickname]conscience@protonmail.com[5] wherein the anonymous writer professed their love for the Victim and encouraged the Victim to leave the University. The writer signed the email "[the Victim's nickname]'s Conscience." The Victim believed this email was from KAY. She found the email very threatening and believed he was suggesting that he was planning other actions in the future to be with her. The most terrifying statement to the Victim was the writer's statement: "You are still free. But you are not unreachable." The Victim took this to mean that KAY considered her freedom to be a gift that he has given her but that it was revocable. She felt the purpose of this letter was to intimidate her. Later this day, UES Office of Student Affairs emailed KAY instructing him to cease all communication with the Victim.

31. On May 15, KAY was notified by UES that he could no longer enroll in the University's courses.

*(Space Intentionally Left Blank)*

---

[5] Proton Mail ("@protonmail.com") is a Swiss-based end to end encrypted email service. In my training and experience, this email service is often used by individuals seeking to hide their identity.

25-mj-3141-JDH

32. On May 20, KAY posted the following poem to his public LinkedIn profile:



33. The Victim believed this poem to be written about her based on his word choice of "coated in striking red fur," which she thought was a reference to her red hair. The Victim found this post to be incredibly unnerving, especially the part "So… eventually… we lit the back of the maze on fire," because she did not know if this was figurative speech or a literal plan of his in the

10

future. She felt uncomfortable with him describing her as a small, vulnerable animal. Her takeaway from the poem was that he was trying to get her out of her life and into his.

34.     KAY continued to email the Victim, the president of the University, and the president of Stanford University daily during the month of June. The content of these emails was primarily focused on reform of the University and the Course. On June 5, KAY emailed the Victim, the president of the University, and the president of Stanford stating that he purchased a first-class nonrefundable plane ticket to attend a negotiations class in person at the University this summer, despite being banned from enrolling in the University's courses.

35.     Delta Air Lines records show that KAY purchased a flight that is scheduled to land at Boston Logan Airport the morning of Friday, July 11, 2025. Delta Air Lines does not have any records of a return ticket for KAY.

36.     On June 24, the University Police Department served KAY with a cease and desist notification to cease all communications with the Victim. KAY acknowledged receipt the same day.

37.     On July 1 and July 2, KAY made multiple posts to his public LinkedIn profile and commented on posts from public LinkedIn pages, such as the University and another university, alleging negligence and harm caused by the Victim while also professing his love for her. The Victim stated she was deeply troubled by these posts as they are damaging to her reputation and reinforce his convictions and actions he has taken against her.

### *KAY's Accounts*

38.     In total, from January 20, 2025 to June 23, 2025, the Victim received approximately 81 harassing email communications from email addresses associated with KAY. The Victim has not received any direct email communication since June 24.

11

25-mj-3141-JDH

39. Approximately 36[6] of these emails were sent to the Victim from the email account assigned to KAY by the University upon enrolling into UES. Subscriber records for this account listed the subscriber name as Edward KAY.

40. Approximately 34 emails were sent to the Victim from an email address that included KAY's last name and that was associated with KAY's company, ODTHA.

41. Approximately seven emails were sent to the Victim from an email address that included KAY's last name and that was associated with Axium Inc., a company that provides networking services and lists KAY as its Senior Network Architect.

42. One email was sent directly from a Hotmail email address and approximately seven email communications added the Hotmail email address as a recipient to emails sent to the Victim. Subscriber records for this account listed the subscriber name as Edward John KAY and listed a date of birth that matched KAY's birthday.

43. The Victim also received harassing contact over LinkedIn from a user with the display name "Edward Sasha Kay CCHt." While the Victim never met KAY in person, she did see him on video during the Zoom lecture he attended on January 29, 2025. The Victim stated that the person she saw on Zoom bore a very strong resemblance to the profile photo of LinkedIn user "Edward Sasha Kay CCHt." Further, LinkedIn records for the user indicate the University email address, Axium Inc. email address, and ODTHA email address identified as belonging to KAY were all associated with the LinkedIn account.

***Impact on the Victim***

44. The persistent communications from and regarding KAY have severely negatively

---

[6] Four of the 36 emails came from the University's student portal, Canvas. Users need the University email address to send messages on Canvas.

impacted the Victim and her husband. They fear for their family's safety and well-being and have had many sleepless nights. Colleagues in whom the Victim confided urged her to sell her home out of fear that KAY would show up at her house. The Victim considered moving even though her family had only recently moved to their current house, but ultimately decided not to due to the financial costs. Instead, she purchased contact sensors, motion detectors, glass break detectors, Ring cameras, door bars, and chain door locks for her residence. The Victim also purchased Ring cameras and a SimpliSafe home security system for her parents' residence nearby. In addition, the Victim attempted to remove her personal information from the Internet, which included any reference to her address. Additionally, the Victim showed a photo of KAY to her young child's pre-school and her neighbors should KAY show up at either place.

45. In one instance, the Victim was aware, based on KAY's LinkedIn posts, that he was scheduled to travel back to the United States from the United Kingdom the weekend of May 23. In anticipation of KAY's travel, the Victim, her husband, and their child stayed at a friend's home in case KAY showed up at her residence.

## CONCLUSION

46. In summary, after one meeting with the Victim via Zoom and one virtual class session in January 2025, KAY became fixated on the Victim and proceeded to harass and intimidate her over email and LinkedIn for the following five months. Specifically, he sent her over 80 emails and LinkedIn communications with content that oscillated between expressing an obsessive and romantic interest in her and expressing hostility toward her for the alleged harm she had caused. He also repeatedly mentioned her minor son by name in his communications and threatened to and subsequently did file a complaint against her with the Bureau of Health Professions Licensure. All of this conduct caused the Victim substantial emotional distress by

25-mj-3141-JDH

placing the Victim in fear of physical harm. She woke up each day feeling like she could not get away from KAY and wondering if that day would be the day that he would show up at her house. She became very afraid for her and her family's safety and described thoughts about KAY as taking over her life, to the extent that she considered moving to a new residence. The Victim also attempted to remove her personal information from the Internet and moved her family to a friend's house when she believed KAY might be in Boston area.

47. Based on all the foregoing, I submit that there is probable cause to believe that EDWARD JOHN KAY has, with the intent to harass and intimidate the Victim, used any interactive computer service or electronic communication service or electronic communication system of interstate commerce or any other facility of interstate or foreign commerce to engage in a course of conduct that caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to the Victim, in violation of Title 18, United States Code, Section 2261A(2)(B).

_Erin O'Brien (by JDH)_
Special Agent Erin O'Brien
Federal Bureau of Investigation

SWORN to telephonically in accordance with Fed. R. Crim. P. 4.1 on this date of July 10, 2025.

_Jessica Hedges_
HONORABLE JESSICA D. HEDGES
UNITED STATES MAGISTRATE JUDGE